IN THE COMMONWEALTH COURT OF PENNSYLVANIA

UnitedHealthcare of : 
Pennsylvania, Inc., : 
 : 
Petitioner : 
 : 
v. : No. 790 C.D. 2017
 : Argued: October 18, 2017
Department of Human Services, : 
 : 
Respondent : 


BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
 HONORABLE ROBERT SIMPSON, Judge
 HONORABLE P. KEVIN BROBSON, Judge
 HONORABLE PATRICIA A. McCULLOUGH, Judge
 HONORABLE ANNE E. COVEY, Judge
 HONORABLE MICHAEL H. WOJCIK, Judge
 HONORABLE ELLEN CEISLER, Judge[1]

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED: April 10, 2018


          UnitedHealthcare of Pennsylvania, Inc. (United) petitions for review of

the order of the Department of Human Services (Department)[2] denying United's bid

---

[1] This case was argued before an *en banc* panel of the Court that included former Judge Joseph M. Cosgrove. Because Judge Cosgrove's service on the Court ended January 1, 2018, this matter was submitted on briefs to Judge Ellen Ceisler as a member of the *en banc* panel.

[2] Pursuant to Section 201 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §61(a), "[t]he executive and administrative work of this Commonwealth shall be performed by the Executive Department, consisting of the . . . Department of Public

protests challenging the Department's decision not to select United to progress to agreement negotiations with respect to reissued Request for Proposal No. 06-15 (Reissued RFP) in which the Department sought managed care organizations (MCOs) to provide HealthChoices Physical Health Program (HealthChoices) services to Medical Assistance (MA) beneficiaries.[3] We reverse.

_____

Welfare . . . ." Pursuant to Section 103(a) of the Act of June 13, 1967, P.L. 31, added by the Act of September 24, 2014, P.L. 2458, 62 P.S. §103(a), "[t]he Department of Public Welfare shall be known as the Department of Human Services."

[3] As this Court has explained:

> [The Department], formerly known as the Department of Public Welfare (DPW), is the state agency that administers the Commonwealth's Medicaid program. "Medicaid is a joint state-federal funded program for [MA] in which the federal government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the state agreed to assume." [The Department] delivers Medicaid benefits in Pennsylvania through either (1) a "fee for service" payment program, where the provider of care is paid by [the Department] on a claim-by-claim basis; or (2) a "managed care" program where [an MCO], under contract with [the Department], is paid on a monthly, fixed-fee basis per enrollee, and the MCO pays the provider pursuant to the terms of an agreement between the MCO and the provider. Pennsylvania's Medicaid managed-care program is HealthChoices.

> * * *

> Section 443.5 of the Human Services Code, Act of June 13, 1967, P.L. 31, added by the Act of July 15, 1976, P.L. 993, 62 P.S. §443.5, relating to prepayment for contracted medical services, authorizes [the Department] to enter into contracts with insurers, such as MCOs, through a competitive bidding process. Section 443.5 of the Human Services Code provides, in relevant part:
> > For categorically needy or medically needy persons eligible for medical assistance, prepaid capitation

2

Under the HealthChoices Program, the Department contracts with MCOs to administer health services to those eligible for Medicaid in five "Zones," Northeast, Southeast, Lehigh-Capital, Southwest, and Northwest. Currently, United operates as an MCO in the Southeast, Lehigh/Capital, and Southwest Zones.

On September 16, 2015, the Department issued Request for Proposal No. 06-16 (Original RFP) seeking MCOs to administer HealthChoices in all five Zones beginning in 2017. The Original RFP stated that the Department would award three-year contracts to up to five MCOs in each Zone and identified the following criteria: (1) technical criteria comprising 80% of the total points; (2) Small Diverse Business Participation with a weight of 20% of the total points; and (3) Domestic Workforce Utilization consisting of "bonus points" to a maximum of 3% of the total points. To qualify as a responsible offeror, the Original RFP stated that an MCO's technical submission must receive a total score of at least 70% of the available points allotted in the evaluation.

On July 21, 2016, the Department issued the Reissued RFP again seeking MCOs to provide HealthChoices services to MA beneficiaries in the five Zones.[4] The Reissued RFP provides for agreements with a three-year term with an

---

payments or insurance premiums for services under the medical assistance State plan may be made on behalf of eligible persons *through competitive bidding* with profit or non-profit contractors, insurers, or health maintenance organizations. Profit and non-profit insurers must be approved under applicable State laws. (Emphasis added.)

*Aetna Better Health of Pennsylvania Inc. v. Department of Human Services*, (Pa. Cmwlth., No. 351 M.D. 2016, filed July 6, 2016), slip op. at 1-3 n.1, 2 (citations omitted).

[4] *See* Section 521 of the Procurement Code, 62 Pa. C.S. §521 ("[A] request for proposals or other solicitation may be canceled . . . at any time prior to the time a contract is executed by all

option for one additional renewal two-year term. The Department's Bureau of Financial Operations, Division of Procurement and Contract Management was the Issuing Office of the Reissued RFP, and "[t]he sole point of contact in the Commonwealth for th[e Reissued] RFP" is Erin Slabonik, the Project Officer for the Reissued RFP. Reproduced Record (R.R.) at 192a.

Initially, the Reissued RFP did not provide for a bid protest mechanism; however, the Department issued Addendum 1 to the Reissued RFP which states that "[i]n the event an Offeror elects to file a bid protest, the Department will accept the bid protest. The Department will address the merits of the bid protest if the bid protest is timely filed." R.R. at 235a.

The Reissued RFP states that the following criteria was to be used to evaluate the proposals: (1) technical criterion based on a Work Statement Questionnaire/Soundness of Approach, Personnel Qualifications and Staffing, and Prior Experience and Performance (80% or 8,000 of the possible 10,000 total points); (2) Small Diverse Business and Small Business (SDB/SB) Participation as determined by the Department of General Services' (DGS) Bureau of Diversity, Inclusion and Small Business Opportunities (BDISBO) (20% or 2,000 of the possible 10,000 total points); and (3) Domestic Workforce Utilization bonus points (up to 3% of the possible 10,000 total points). R.R. at 226a-228a. In order to be considered a responsible offeror, "and therefore eligible for selection for agreement

_____

parties when it is in the best interests of the Commonwealth. . . . The reasons for the cancellation or rejection shall be made part of the contract file."). *See also Scientific Games International, Inc. v. Department of Revenue*, 66 A.3d 740, 758 (Pa. 2013) ("The Legislature has deliberately excluded Section 521 cancellations from the scope of the right of protest. *See* 62 Pa. C.S. §1711.1(a) (prescribing that bidders, offerors, and certain others "aggrieved in connection with the solicitation or award of a contract, *except as provided in section 521 (relating to cancellation of invitations for bids or requests for proposals)*, may protest to the head of the purchasing agency in writing" (emphasis added)).").

4

negotiations," the total score for the technical submission in a proposal for each Zone "must be greater than or equal to 75% of the available technical points." *Id.* at 228a.

The Reissued RFP specifically provides that "[t]he Department, in its sole discretion, may undertake negotiations with Offerors whose proposals, in the judgment of the Department, show them to be qualified, responsible, and capable of providing the services." R.R. at 195a.[5] However, with respect to "Discussions for Clarification," the Reissued RFP states, "Offerors may be required to make an oral or written clarification of their proposals to the Department to ensure thorough mutual understanding and Offeror responsiveness to the solicitation requirements. The Project Officer will initiate requests for clarification." *Id.* at 201a-202a. Additionally, the Reissued RFP provides that "[f]rom the issue date of this RFP until the Department selects proposals for award, the Project Officer is the sole point of contact concerning this RFP. Any violation of this condition may be cause for the Department to reject the offending Offeror's proposal." *Id.* at 203a. Finally, the Department would "notify the selected Offerors in writing of their selection for negotiations after determining those proposals that are most advantageous and in the best interest of MA beneficiaries and the Commonwealth." *Id.* at 205a.

---

[5] Section 513(f) of the Procurement Code states:

> As provided in the [RFP], discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining best and final offers [(BAFOs)]. Responsible offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. In conducting the discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors.

62 Pa. C.S. §513(f).

The Department received proposals from eleven different MCOs: nine for the Southeast Zone; ten for the Lehigh/Capital Zone; seven for the Southwest Zone; six for the Northwest Zone; and seven for the Northeast Zone. United submitted a proposal in response to the Reissued RFP to provide services in all five Zones. Likewise, Pennsylvania Health & Wellness, Inc. (PHW) sought to provide services in all five Zones. On November 18, 2016, the Project Officer notified United that its "proposals were not among those proposals determined to be the most advantageous to the Commonwealth," and United filed a bid protest based on the Department's November Selection Memorandum.

However, the November Selection Memorandum revealed that BDISBO scored the SDB/SB portion of the proposals on a 200-point scale and not a 2,000-point scale as provided in the Reissued RFP. On December 12, 2016, the Department notified BDISBO of the scoring error and asked BDISBO to correct the mistake. On December 15, 2016, the Department's Secretary and DGS's Secretary notified United that the November Selection Memorandum would be rescinded due to the error in scoring. As a result, the Department did not issue a written determination of United's bid protest stemming from the November Selection Memorandum.

On December 19, 2016, Leesa Allen, the Department's Deputy Secretary for the Office of Medical Assistance Programs (OMAP), and Sallie Rodgers, Deputy Chief Counsel in the Department's Office of General Counsel, met with Michael Neidorff, Chairman and CEO of Centene Corporation (Centene), PHW's parent corporation, and Brent Layton, an Executive Vice President and the Chief Business Development Officer of Centene. R.R. at 5333a-5337a. Deputy Secretary Allen requested the meeting with PHW to discuss PHW's operational

6

readiness to operate as an MCO on a statewide basis. *Id.* at 5334a-5335a. Allen was concerned about PHW's readiness because of: the abbreviated time frame for the implementation of the HealthChoices Program agreements; the significant amount of resources that were necessary for a successful Readiness Review; the planned implementation of Community HealthChoices Program (CHC),[6] a new managed care initiative separate from the HealthChoices Program that will begin implementation in 2018 and for which PHW is a selected offeror in all five Zones; and the fact that PHW was a new plan coming into the HealthChoices Program. *Id.* at 5335a.

From Layton's perspective, the December 19th meeting with the Department's Deputy Secretary and Deputy Chief Counsel was generally about PHW's readiness to perform in various Zones, the status of PHW's Certificate of Authority (COA) to conduct business in Pennsylvania, and its approval to operate in specific counties. R.R. at 5330a.[7] Potential contracting issues in various Zones were

---

[6] As the Department has described, the CHC program is "a new managed care initiative separate from the HealthChoices [] Program, which will begin implementation in January 2018 and for which PHW is a selected offeror in all five CHC zones." Final Agency Determination at 9 n.9.

[7] Section I-4 of the Reissued RFP states, in relevant part:

**Participation in the HealthChoices [Physical Health] Program will be limited to Commonwealth-licensed [Health Maintenance Organizations (HMOs)].** All MCOs awarded an agreement for the HealthChoices PH Program for any zone will be required to have a [COA] to operate as an HMO in Pennsylvania, as well as Pennsylvania Department of Health (DOH) operating authority in each county in each zone for which they are selected, **no later than three months prior to the anticipated implementation date of 04/01/2017. By this date, all MCOs awarded an agreement for a HealthChoices PH Zone must provide to the Department, through the Project Officer, a copy of their [COA] to operate as**

7

discussed, but PHW did not modify or withdraw its proposal in any Zone. *Id.* Layton indicated that if PHW was selected by the Department to proceed to negotiations, as a new entrant into an existing market, one of the issues that it would want to understand and discuss is the Department's auto-assignment algorithm, but no specific changes to the auto-assignment algorithm were agreed to by the parties. *Id.*

On December 22, 2016, the Department issued a new December Selection Memorandum, which corrected the SDB/SB scoring and made the recommended selections of MCOs for agreement negotiations for the HealthChoices Program in all five Zones. R.R. at 238a-247a. The Department selected five MCOs in the Southeast Zone; four MCOs each in the Southwest Zone and the Lehigh/Capital Zone; and three MCOs each in the Northeast Zone and the Northwest Zone. *Id.* at 239a. Based on the Department's scoring, United was not selected for negotiations in any Zone based on its rankings as seventh in the Southeast Zone; fifth in the Southwest Zone; eighth in the Lehigh/Capital Zone; sixth in the Northeast Zone; and fifth in the Northwest Zone. *Id.* at 242a-244a.

In contrast, although the Department's scoring of PHW's proposals were high enough for selection in all five Zones, the Department determined that PHW would participate in the Southeast, Lehigh/Capital, and Southwest Zones. R.R. at 245a. This determination was based on "discussions between [PHW] and

_____

**an HMO in Pennsylvania, as well as a copy of the correspondence from the Pennsylvania DOH granting operating authority in each county in the Zone(s) for which they were selected for award**.

R.R. at 194a-195a (emphasis in original).

8

the Department, [in which] the Department agreed that [PHW] will participate in the Southeast, Southwest, and Lehigh/Capital zones." *Id.*

On December 28, 2016, United filed a Supplemental Protest challenging the December Selection Memorandum. R.R. at 1a-8a. United claimed that: (1) its reduction from a selected offeror in all five Zones under the Original RFP to two Zones and then zero Zones under the Reissued RFP, without any logical explanation, is arbitrary and capricious, an abuse of discretion, and not in accordance with the law; (2) its reduction from two Zones under the Reissued RFP to zero Zones after the December rescoring is arbitrary and capricious, an abuse of discretion, and not in accordance with the law; (3) the changes between the Original RFP and the Reissued RFP were inappropriately weighted in the evaluation of the proposals thereby constituting arbitrary and capricious actions, an abuse of discretion, and actions contrary to law; and (4) the Department's failure and refusal to provide any documents or information to support its evaluation and score of the proposals is arbitrary and capricious, an abuse of discretion, and contrary to law. *Id.* United also reiterated a prior request for all documents relating to the Department's evaluation, scoring, and selection of proposals in all five Zones; all proposals submitted by other offerors; all documents relating to the scoring of the SDB portion of the proposals; and all documents reflecting or relating to debriefing sessions held with any other offerors. *Id.* at 7a. Finally, United also reiterated its prior request for an evidentiary hearing on its protest. *Id.*[8] Geisinger Health Plan (Geisinger), Gateway Health Plan, Inc. (Gateway), PHW, and OMAP filed responses to United's bid protest outlining

---

[8] *See* Section 1711.1(e) of the Procurement Code, 62 Pa. C.S. §1711.1(e) ("The head of the purchasing agency or his designee shall review the protest and any response or reply and may request and review such additional documents or information he deems necessary to render a decision and may, at his sole discretion, conduct a hearing.").

9

various reasons why the protest should be denied, *id.* at 87a-128a, 168a-349a, and United filed a reply, *id.* at 425a-448a.

On January 5, 2017, United filed a Supplemental Protest following the Department's announcement of the six offerors selected to negotiate contracts in all of the Zones. R.R. at 51a-56a. United asserted that the Department's selection of PHW is arbitrary and capricious, an abuse of discretion, and contrary to law because PHW is not a "responsible offeror" under the Reissued RFP. *Id.* at 52a-55a.[9] United also reasserted its requests for documents and for an evidentiary hearing. *Id.* at 55a. PHW and OMAP filed responses to United's bid protest outlining the reasons why it should be denied, *id.* at 129a-167a, 449a-480a, and United filed a reply, *id.* at 522a-564a.

On January 11, 2017, the Department held a debriefing conference regarding United's bid protest. R.R. at 378a-384a. On January 18, 2017, United filed a Supplemental Protest in which it alleged that it had first learned that the rescoring of the proposals was the result of the Department's December 19th debriefing with PHW and that PHW was permitted to withdraw the portions of its proposal relating to the Northeast and Northwest Zones. *Id.* United claimed that: (1) the Department acted arbitrarily and capriciously, abused its discretion, and acted contrary to law by permitting PHW to modify its proposal in violation of Section I-12 of the Reissued RFP,[10] Section 513(f) of the Procurement Code, and case law; (2)

---

[9] *See* Section 513(g) of the Procurement Code, 62 Pa. C.S. §513(g) ("The responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency, taking into consideration price and all evaluation factors, shall be selected for contract negotiations.").

[10] Section I-12 of the Reissued RFP states, in relevant part:

10

the Department's review and use of SDB scoring was arbitrary and capricious, an abuse of discretion, and contrary to law; (3) the Department did not properly apply and follow the Reissued RFP in its evaluation and scoring of the offerors' technical proposals thereby constituting arbitrary and capricious scoring, an abuse of discretion and scoring contrary to law; and (4) it is entitled to all documents or information considered by the Department in the issuance or evaluation of bids or the evaluation of bid protests under the Reissued RFP pursuant to Section 1711.1 of the Procurement Code. *Id.* at 351a-369a. United again requested discovery to obtain additional information from the Department and an evidentiary hearing on its bid protest. *Id.* at 369a-370a. Geisinger, Gateway, PHW, and OMAP filed responses to United's bid protest outlining various reasons why the protest should be denied, *id.* at 481a-521a, 565a-738a, and United filed a reply, *id.* at 739a-775a.

On February 24, 2017, United filed another Supplemental Protest arguing that the December 19th meeting violated the "equal treatment" requirement of Section 513(f) of the Procurement Code; the "blackout period" provided in

---

For this RFP, the proposal must remain valid for 120 days or until an agreement is fully executed. If the Department selects the Offeror's proposal for award, the contents of the selected Offeror's proposal will become, except to the extent the contents are changed through negotiations, obligations under the agreement.

Each Offeror submitting a proposal specifically waives any right to withdraw or modify it, except that the Offeror may withdraw its proposal by written notice received at the Issuing Office's address for proposal delivery prior to the exact hour and date specified for proposal receipt [or] in person prior to the exact hour and date set for proposal receipt . . . .

R.R. at 199a.

11

Section I-21 of the Reissued RFP;[11] and the automatic stay provisions of Section 1711.1(k) of the Procurement Code[12] based on the November and December bid protests. R.R. at 779a-785a. United also claimed that the Department violated the Procurement Code and the Reissued RFP by unfairly favoring PHW regarding the required COA to operate as an MCO issued by the Departments of Health and Insurance, and evidence of network adequacy in the proposal. *Id.* at 785a-787a. United again requested discovery to obtain additional information from the Department and an evidentiary hearing on its bid protest. *Id.* at 787a. Geisinger, Gateway, PHW, and OMAP filed responses to United's bid protest outlining various reasons why the protest should be denied, *id.* at 838a-851a, 955a-1021a, and United sought clarification from OMAP, *id.* at 1022a-1024a.

On March 3, 2017, United filed another Supplemental Protest stating that it has raised throughout its prior protests the Department's failure and refusal to provide any documents or other information to explain its evaluation and scoring of the proposals. R.R. at 816a. United outlined the numerous documents that the

---

[11] Section I-21 states that "[f]rom the issue date of this RFP until the Department selects proposals for award, the Project Officer is the sole point of contact concerning this RFP. Any violation of this condition may be cause for the Department to reject the offending Offeror's proposal." R.R. at 203a.

[12] 62 Pa. C.S. §1711.1(k). Section 1711.1(k) states:

> In the event a protest is filed timely under this section and until the time has elapsed for the protestant to file an appeal with Commonwealth Court, the purchasing agency shall not proceed further with the solicitation or with the award of the contract unless and until the head of the purchasing agency, after consultation with the head of the using agency, makes a written determination that the protest is clearly without merit or that award of the contract without delay is necessary to protect substantial interests of the Commonwealth.

Department eventually released due to its requests submitted to the Department under the Right to Know Law (RTKL)[13] and its prior protests. *Id.* at 816a-818a. United argued that Section I-4 of the Reissued RFP required the selected offerors to have a COA to operate as an HMO in Pennsylvania and DOH approval to operate in the counties comprising the Zone or Zones for which they were selected by January 1, 2017. *Id.* at 819a. United asserted that the Department inappropriately waived this technical requirement of the Reissued RFP with respect to PHW's proposal that was selected. *Id.* at 819a-820a. United also claimed that PHW's failure to meet this technical requirement in all Zones was magnified by the Department's favoritism in the technical scoring of the proposals. *Id.* at 820a-823a. United also asserted that the Department's Deputy Director erred in failing to compel disclosure of information that was redacted in the documents released pursuant to its RTKL request relating to the SDB/SB scoring. *Id.* at 823a-825a. United again renewed its request for documents and for an evidentiary hearing. *Id.* at 825a. Geisinger, Gateway, PHW, and OMAP filed responses to United's bid protest outlining various reasons why the protest should be denied, *id.* at 904a-949a, 952a-1021a, 1025a-1032a, and United filed a reply, *id.* at 1035a-1051a.

On April 13, 2017, United filed another Supplemental Protest outlining the information that it had received which demonstrates that PHW may have subcontracted with SDB companies that are not proper SDBs under the Reissued RFP, including a subsidiary of PHW. R.R. at 5236a-5243a. United requested all records showing a connection between PHW and its affiliated subsidiary companies listed as SDBs in PHW's proposal and reiterated its request for an evidentiary hearing. *Id.* at 5243a-5244a. Geisinger, Vista Health Plan Inc. (Vista), PHW, and

---

[13] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

OMAP filed responses to United's bid protest outlining various reasons why the protest should be denied, *id.* at 5327a-5328a, 5338a-5342a, 5345a-5352a, and United filed a reply, *id.* at 5459a-5475.

On April 17, 2017, the Department's Director requested affidavits from the Department's Deputy Secretary for OMAP and Centene's Executive Vice President and the Chief Business Development Officer regarding the December 19th meeting to address: (1) the individuals present at the meeting; (2) the meeting's purpose; (3) the issues or subject matter discussed; and (4) the agreements or conclusions reached during or as a result of the meeting. R.R. at 5325a-5326a. The affidavits were submitted on April 24, 2017. *Id.* at 5330a-5337a.

On May 5, 2017, United submitted a response to the affidavits, noting that they demonstrate that the Department violated the Procurement Code and the Procurement Handbook[14] in at least two ways: (1) by conducting unilateral proposal

_____

[14] Section 301(a) of the Procurement Code states that the "[f]ormulation of procurement policy governing the procurement . . . of . . . services . . . for executive . . . agencies shall be the responsibility of [DGS] as provided for in Subchapter B (relating to procurement policy)." 62 Pa. C.S. §301(a). In turn, Section 311 of the Procurement Code states that DGS "may promulgate regulations governing the procurement . . . of any and all . . . services . . . to be procured by Commonwealth agencies," and that DGS "shall consider and decide matter of policy within the provisions of this part." 62 Pa. C.S. §311. To this end, DGS promulgated the Procurement Handbook to "provide[] a standard reference to established policy, procedures, and guidelines for the procurement of . . . services . . . under the authority of the Commonwealth Procurement Code," and that "the policies, procedures, and guidelines of this handbook apply to the procurement of all . . . services . . . in which an executive . . . agency is a participant." Procurement Handbook Part I, Chapter 1(A), (B). However, DGS explains that "[t]his handbook constitutes guidelines to . . . the executive . . . agencies concerning the procurement of . . . services," but it "is not and does not purport to operate as a regulation and does not establish a binding norm nor have or purport to have the force of law." *Id.* at Part I, Chapter 1(D). As a result, "[a] procurement or resulting contract shall not be invalidated for failing to strictly adhere to the provisions of this handbook provided the procurement or contract otherwise complies with the [] Procurement Code." *Id. See also id.* at Part I, Chapter 1(C)(2) ("The policies, procedures, and guidelines of this handbook will not apply to . . . [MA] provider agreements administered by [the Department] . . . .").

14

negotiations with PHW and reaching an agreement with PHW regarding the awards; and (2) by making a post-hoc change to the evaluation criteria for the required provider networks. R.R. at 5354a-5360a. United also argued that the Department must hold a hearing to address the issues raised in United's protests and the affidavits, and must produce all of the documents that United has requested, including those relating to the December 19th meeting between the Department and PHW, because the affidavits contradict the Department's and PHW's statements regarding the December 19th meeting and raise numerous questions of material fact. *Id.* at 5360a-5366a.

Ultimately, on June 5, 2017, the Department's Director issued a Final Agency Determination disposing of all of United's bid protests. Final Agency Determination at 1-34. With respect to United's claims regarding the December 19th meeting, the Director initially noted that "[i]n order to protest the solicitation or award of a contract or agreement, a bidder or offeror must be 'aggrieved' in

---

Nevertheless, this Court has relied on the Procurement Handbook where the Procurement Code does not specifically conflict with the relevant Procurement Handbook provision. *See, e.g., Global Tel\*Link Corporation v. Department of Corrections*, 109 A.3d 809, 818-19 (Pa. Cmwlth.), *appeal denied*, 121 A.3d 497 (Pa. 2015) ("GTL argues that Securus's participation in its protest and hearing was unlawful because the only proper parties to a protest are the protestant and the contracting officer under Section 1711.1 of the Procurement Code, and the selected bidder may not participate because it is not an enumerated party to a protest under the statute. However, the Secretary noted that while the Procurement Code does not specifically provide for the participation of other parties in a protest, Chapter 58(D) of the Procurement Handbook provides for the participation of 'all bidders and offerors who appear to have a substantial and reasonable prospect of winning the award . . . .' In sum, the Secretary did not err in permitting Securus to participate in the instant protest or hearing because its participation is not prohibited by the Procurement Code and is specifically provided for in the Procurement Handbook.") (citations omitted). The Procurement Handbook may be found on DGS's website at http://www.dgs.pa.gov/State%20Government/Materials-and-Services-Procurement/Procurement-Handbook/Pages/default.aspx#part1 (last visited March 2, 2018).

connection with the solicitation or award. 62 Pa. C.S. §1711.1(a) . . . ." *Id.* at 26 (citations omitted). The Director determined that United failed to show that it has been aggrieved by any contact or discussion between OMAP and PHW because "[t]he non-selection of PHW in two of the five zones conferred a benefit or advantage to United by rendering an additional 'slot' available for selection," and that "[t]he only offeror that may potentially have been aggrieved by the non-selection of PHW in the Northeast and Northwest zones was PHW itself." *Id.* As a result, the Director concluded, "United was not aggrieved by not having a similar meeting with OMAP." *Id.*[15]

Alternatively, the Director determined that the December 19th meeting did not violate the automatic stay provision of Section 1711.1(k) of the Procurement Code based on United's bid protest of the November Selection Memorandum. Final Agency Determination at 26. The Director explained that "[u]pon the rescission of the original sections [in that Memorandum], the protest of those selections necessarily became moot thereby eliminating any need for a written determination of those protests" and that "United has not explained why a determination of a moot protest is required." *Id.* Accordingly, the Director concluded, "[e]ven assuming a

---

[15] We find untenable the Director's determination that United was not "aggrieved" by the selection process. First, the Director only determined that United was not aggrieved with respect to the two Zones from which PHW withdrew its proposal, not addressing United's aggrievement with respect to the three remaining Zones. Moreover, in considering a request for a preliminary injunction with respect to the Original RFP, we held that the Department's failure to comply with the provisions of the Procurement Code, as alleged in United's protest herein, constitutes "irreparable injury." *See Aetna Better Health of Pennsylvania Inc.*, slip op. at 27 ("Failure to comply with a statute is sufficiently injurious to constitute irreparable harm. *Wyland v. West Shore Sch. Dist.*, 52 A.3d 572, 583 (Pa. Cmwlth. 2012).").

stay was in place, any violation thereof was a mere technical violation and does not warrant cancelling the selections made under the Reissued RFP." *Id.* at 27.

The Director also determined that the December 19th meeting did not violate the provisions of Section 513(f) of the Procurement Code, requiring that all offerors "be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals," because Section I-17 of the Reissued RFP[16] "permits the Department to seek oral or written clarifications of an offeror's proposal to ensure mutual understanding and responsiveness to the solicitation requirements." Final Agency Determination at 27. While Section I-17 "provides that the Project Officer will initiate requests for clarification," and "[w]hile OMAP acknowledges that the December 19 meeting was initiated by Secretary Allen and not the Project Officer, both OMAP and PHW describe the primary purpose of the meeting as an inquiry into PHW's readiness to operate on a statewide basis and to ensure an adequate network of providers." *Id.* (citations omitted).

The Director also found that the Department's discussions did not violate Section 513(g) of the Procurement Code requiring the Department to select a "responsible offeror" for contract negotiations. Final Agency Determination at 28-29. The Director explained that "[t]here is a distinction between earning a score high enough in a zone to be a selected offeror under the Reissued RFP, and being able to ramp up a business operation as complex and demanding as being an MCO in both the [HealthChoices] and CHC programs." *Id.* at 28. The Director found that "[t]here is nothing improper in seeking assurance from an MCO that stands to go from zero

---

[16] Section I-17 states "Offerors may be required to make an oral or written clarification of their proposals to the Department to ensure thorough mutual understanding and Offeror responsiveness to the solicitation requirements. The Project Officer will initiate requests for clarification." R.R. at 202a.

17

to five zones in not just the [HealthChoices] program, but the new CHC program, as well," and that "[e]ven if the result of the December 19 meeting was that PHW was not selected in the Northeast zone or the Northwest zone, . . . such result is evidence that OMAP exercised its judgment when evaluating which proposals were most advantageous to the Commonwealth." *Id.*

The Director also determined that United "has presented no evidence that the Department offered any *quid pro quo* in exchange for PHW's non-selection in two zones or that PHW altered its proposal to withdraw from those zones," and that "[t]he December Selection Memorandum, which still lists PHW in the Northeast and Northwest zones, demonstrates that PHW did not withdraw or modify its proposals in those zones." Final Agency Determination at 28 (citations and footnote omitted). The Director explained that even if he were to accept United's characterization of the meeting, it was permitted under Section I-5 of the Reissued RFP, which permits the Department, "'in its sole discretion, [to] undertake negotiations with Offerors whose proposals, in the judgement of the Department, show them to be qualified, responsible, and capable of providing the services,'" and Section 513(f) of the Procurement Code which "permits the Department to conduct 'discussions and negotiations' with responsible offerors as long as responsible offerors are accorded 'fair and equal treatment with respect to any opportunity for discussion and revision of proposals.'" *Id.* (citation omitted).

The Director also determined that "the Department had discretion to engage in negotiations with PHW" at the December 19th meeting and that it did not violate Section 513(f) because "[f]air and equal treatment does not mean identical treatment." Final Agency Determination at 29 (citation omitted). The Director noted that while "[i]n the December 19 meeting, a term of the agreement was

18

discussed, namely the auto-enrollment algorithm," the meeting did not violate "fair and equal treatment" under Section 513(f) "given that no changes or agreements were made as a result of that discussion." *Id.*

The Director rejected United's reliance on *Pepco Energy Services, Inc. v. Department of General Services*, 49 A.3d 488 (Pa. Cmwlth. 2012),[17] stating that "United's contention that *Pepco* stands for the proposition that the contracting office is precluded from conducting separate negotiations with individual offerors before determining the offeror's responsibility is incorrect. Rather, the language of the Reissued RFP governs whether such discussions may take place." Final Agency Determination at 29. The Director explained that Section I-5 of the Reissued RFP "provide[s] for the opportunity to negotiate with offerors," and Section I-17 gave OMAP "the ability to require offerors to make oral or written clarification of their proposals to ensure mutual understanding and responsiveness to the solicitation requirements." *Id.* at 29-30 (citations omitted). The Director found that, "[g]iven

---

[17] In *Pepco*, the bidder submitted a proposal to DGS in response to an RFP seeking a Design Build Contractor to design, finance, construct, own, operate, and maintain a state-of-the-art Combined Heating, Cooling, and Power Plant to provide electricity, steam, and hot and chilled water to a proposed State Correctional Facility in Montgomery County. In the proposal, Pepco stated that it was based on the understanding that it will have the opportunity to negotiate the Energy Services Agreement, the Ground Lease, and the Surety Agreement prior to selection. Ultimately, DGS rejected the proposal as non-responsive because the RFP provided that these provisions were not negotiable and the proposal's conditional language constituted an impermissible alternative proposal. Pepco filed a bid protest that DGS denied and appealed to this Court. On appeal, Pepco argued that DGS erred in rejecting the proposal as non-responsive because its attempt to negotiate key terms and conditions was valid under Section 513(g) of the Procurement Code. Ultimately, we rejected Pepco's "contention that under Section 513(g), following the submission of a proposal, every term of a contract becomes negotiable, including provisions that the issuing agency already identified as non-negotiable in its [RFP]." *Pepco*, 49 A.3d at 493. We also concluded, "pursuant to the provisions of the RFP, [Pepco] had no right to negotiate the terms of the Design Build Contract and the documents appended to it." *Id.* at 494.

the broad discretion given to the contracting office under Section 513 and the broad permissive language of the Reissued RFP, I find that the December 19 meeting did not violate the tenets of *Pepco*." *Id.* at 30.

Based on the foregoing, the Director concluded that "United has failed to meet its burden of demonstrating that the Department's determination to proceed to negotiations with PHW in three zones was clearly erroneous, arbitrary, capricious, or contrary to law" and that United's claims in this regard "are without merit." Final Agency Determination at 30. Accordingly, the Director denied United's bid protests. *Id.* at 34.[18]

---

[18] The Director also denied United's requests for the production of documents or for an evidentiary hearing, and rejected as without merit United's claims that: (1) OMAP's and the Department's misunderstanding of the standard of review, the burden of proof, and what constitutes the record in a bid protest created a general lack of transparency that violates United's procedural due process rights; (2) the Department's ongoing discussion with PHW violates the automatic stay provisions of Section 1711.1(k) of the Procurement Code; (3) OMAP's evaluation and scoring of the technical submittals was arbitrary, capricious, an abuse of discretion, or contrary to law; (4) the manner in which OMAP and DGS designed and scored the SDB/SB submittals was arbitrary, capricious, an abuse of discretion, or contrary to law; and (5) the Department unfairly favored PHW regarding building the required provider network. *See* Final Agency Determination at 11-25, 32-33.

In this appeal,[19, 20] United claims that the Director erred in denying its bid protests because the December 19th meeting between the Department's Deputy Secretary for OMAP and Deputy Chief Counsel in the Department's Office of General Counsel, and Centene's Chairman and CEO and Executive Vice President and the Chief Business Development Officer is not authorized by the Reissued RFP thereby violating the Procurement Code and the Procurement Handbook. We agree.

As noted above, Section 513(f) of the Procurement Code states that "[a]s provided in the [RFP], discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining [BAFOs,[21]]"

---

[19] Section 1711.1(i) of the Procurement Code states that this Court "shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency," and "[s]hall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law." 62 Pa. C.S. §1711.1(i). *See also* Section 561 of the Procurement Code, 62 Pa. C.S. §561 ("The determinations required by the following sections are final and conclusive unless they are clearly erroneous, arbitrary, capricious or contrary to law: . . . Section 513(a) and (g) (relating to competitive sealed proposals)."). Purchasing agencies are bound by the express terms of their RFPs. *American Totalisator Co. v. Seligman*, 414 A.2d 1037, 1041 (Pa. 1980). An agency abuses its discretion when it fails to follow its own regulations and procedures. *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission*, 542 A.2d 606, 608 (Pa. Cmwlth. 1988).

[20] PHW, Geisinger, Gateway, and Health Partners Plans have intervened in United's appeal. Additionally, Aetna Better Health of Pennsylvania, Inc. (Aetna) filed a petition for review in our original jurisdiction, and both Aetna and Vista Health Plan, Inc. have appealed Department orders denying their bid protests, with respect to the Reissued RFP. Their actions are lodged in this Court at Nos. 274 M.D. 2017 and 820 C.D. 2017, respectively. By Stipulation and Order approved by this Court on June 30, 2017, the Department agreed to stay all procurement activities with regard to the Reissued RFP, including negotiations of any kind or readiness review activities, until this Court's disposition of Aetna's petition for review. The Department also agreed that the existing HealthChoices agreements will remain in effect and will not be terminated.

[21] The Procurement Code does not define "discussions," "negotiations," or "clarification." As a result, the rules of statutory construction apply. *City of Philadelphia v. City of Philadelphia Tax Review Board ex rel. Keystone Health Plan East, Inc.*, 132 A.3d 946, 952 (Pa. 2015). "'When statutory words or phrases are undefined by the statute, the Court construes the words according to their plain meaning and common usage.' A statute must be given its plain and obvious

21

and that "[r]esponsible offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals." 62 Pa. C.S. §513(f). *See also* Part I, Chapter 6(B)(10)(e)(1)(f) of the Procurement Handbook ("It is imperative that offerors selected to submit a [BAFO] be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals."). In turn, Section 513(g) provides that "[t]he responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency . . . shall be selected for contract negotiation." 62 Pa. C.S. §513(g).

We disagree with the Director's determination that *Pepco* has no relevance in this matter. With respect to subsections (f) and (g) of Section 513 of the Procurement Code, in *Pepco* this Court explained:

---

meaning." *Harmer v. Pennsylvania Board of Probation and Parole*, 83 A.3d 293, 299 (Pa. Cmwlth.), *appeal denied*, 97 A.3d 746 (Pa. 2014) (citations omitted). "[I]t is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." *Hoffman Mining Company, Inc. v. Zoning Hearing Board of Adams Township*, 32 A.3d 587, 592 (Pa. 2011) (citation omitted). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006), *appeal denied*, 923 A.2d 1175 (Pa. 2007).

"Discussion" is defined as "consideration of a question in open usu. informal debate" and "argument for the sake of arriving at truth or clearing up difficulties." *Webster's Third New International Dictionary* 648 (1976). "Negotiation" is defined as "a business transaction" and the "action or process of negotiating or of being negotiated." *Id.* at 1514. In turn, "negotiate" is defined as "to communicate or confer with another so as to arrive at the settlement of some matter;" to "meet with another so as to arrive through discussion at some kind of agreement or compromise about something." *Id. See also Black's Law Dictionary* 1150 (10th ed. 2009) (defining "negotiation" as "[a] consensual bargaining process in which parties attempt to reach agreement on a disputed or potentially disputed matter" and "[d]ealings conducted between two or more parties for the purpose of reaching an understanding."). Finally, "clarification" is defined as "the act or process of clarifying." *Id.* at 415. In turn, "clarify" is defined as "to explain clearly," to "make understandable," or "to make less complex or less ambiguous." *Id.*

22

Section 513(g) of the Code [] provides that an offeror "shall be selected for contract negotiation[."] Section 513(g) of the Code first requires that the offeror be a "*responsible offeror*." (Emphasis added). The Code specifically defines "responsible offeror" as "[a]n offeror that has submitted a *responsive proposal* and that *possesses the capability to fully perform the contract requirements in all respects* and the integrity and reliability to assure good faith performance." Section 103 of the Code, 62 Pa. C.S. §103 (emphasis added). The Code further defines "responsive proposal" as "[a] proposal which *conforms in all material respects to the requirements and criteria in the [RFP]*." *Id.* (emphasis added). By definition, therefore, if a proposal on its face does not meet the requirements and criteria of a[n RFP], then it is not considered a responsive proposal and the offeror cannot be considered a responsible offeror. Thus, read in concert with Section 103 of the Code, Section 513(g) of the Code establishes a framework whereby the issuing agency must first determine if the offeror is a responsible offeror, meaning that its proposal meets the requirements and criteria of the [RFP]. Then, the responsible offeror with the most advantageous proposal is "selected for contract negotiation." This interpretation is further supported by the language of Section 513(g), which provides that the "responsible offeror whose proposal is determined . . . to be the most advantageous . . . , *taking into consideration . . . all evaluation factors*, shall be selected for contract negotiation." . . .

[Additionally,] a[n RFP] may provide for contract negotiations. In *Language Line Services, Inc. v. Department of General Services*, 991 A.2d 383 (Pa. Cmwlth.), *appeal denied*, [13 A.3d 481 (Pa. 2010)], we noted that Section 513 of the Code allows an issuing agency "the opportunity to enter into discussions and negotiations with responsible offerors *'[a]s provided in the [RFP].'*" *Language Line Services*, 991 A.2d at 390 (emphasis added). It also provides that "[r]esponsible offerors shall be accorded fair and equal treatment." Section 513(f) of the Code. In *Language Line Services*, when considering whether the issuing agency had violated the Code and fundamental principles governing public

contracting when it requested [BAFOs] from only certain bidders, this Court looked to the Code and the language of the [RFP] at issue. The language in the [RFP] in that case "specifically stated and put offerors on notice that [the issuing agency] was reserving the right to limit BAFO discussions to responsible offerors whose proposals were considered 'reasonably susceptible of being selected for award.'" *Id.* . . .

Based upon the language of Section 513(g) of the Code and our decision in *Stanton–Negley* [*Drug Company v. Department of Public Welfare*, 943 A.2d 377 (Pa. Cmwlth.), *appeal denied*, 959 A.2d 321 (Pa. 2008)], it is apparent that Section 513, in itself, does not entitle an offeror to engage in contract negotiations before the issuing agency makes a determination regarding whether the offeror is a responsible offeror (*i.e.*, whether the offeror submitted a responsive or non-responsive proposal) or before the issuing agency makes a determination as to which proposal is most advantageous. An agency, however, through its [RFP], may provide offerors with an opportunity to negotiate or provide revised proposals throughout the [RFP] process. *See Stanton–Negley*.

*Pepco*, 49 A.3d at 493-94.

With respect to the December 19th meeting in this case, the Department's Director found as fact that the "Deputy Secretary [] had requested the December 19 meeting with PHW to discuss PHW's readiness to operate as an MCO on a statewide basis," and that she "was concerned with PHW's operational readiness because of 'the abbreviated time frame for the implementation of the new [] HealthChoices agreements, the significant amount of resources necessary for a successful Readiness Review, the planned implementation of CHC, and PHW coming into the HealthChoices Program as a new plan.'" Final Agency Determination at 9. The Director also found that "potential contracting issues were discussed, that PHW did not modify or withdraw its proposal in any zone, and that

24

if selected to proceed to negotiations, PHW would 'want to understand and discuss' the Department's auto-assignment algorithm, but no specific changes to the auto-assignment algorithm were agreed to." *Id.* at 10.

Whether the December 19th meeting between the Department's Deputy Secretary and Deputy Chief Counsel was a "discussion" or "negotiation" with PHW "for the purpose of clarification and of obtaining a [BAFO]," or merely to assist in determining whether PHW was a "responsible" bidder, within the purview of Section 513 of the Procurement Code, it is clear that the meeting violated the provisions of the Procurement Code, the RFP and the Procurement Handbook. It is true that Section I-5 of the Reissued RFP states, "[t]he Department, in its sole discretion, may undertake negotiations with Offerors whose proposals, in the judgment of the Department, show them to be qualified, responsible, and capable of providing the services." R.R. at 195a. *See also* Section I-26, *id.* at 205a ("The Department will notify the selected Offerors in writing of their selection for negotiations after determining those proposals that are most advantageous and in the best interests of MA beneficiaries and the Commonwealth."); Section III-3, *id.* at 226a ("The Department will notify in writing of its selection for negotiations the responsible Offerors whose proposals are determined to be the most advantageous and in the best interests of MA beneficiaries and the Commonwealth as determined by the Department after taking into consideration all evaluation and selection factors.").

However, Section I-2 of the Reissued RFP states that, prior to such a determination and written notification, the Department's Bureau is the Issuing Office and that "[t]he sole point of contact in the Commonwealth for this RFP shall be . . . the Project Officer for this RFP." R.R. at 192a. *See also* Section I-21, *id.* at

25

203a ("From the issue date of this RFP until the Department[] selects proposals for award[,] the Project Officer is the sole point of contact concerning this RFP."). Likewise, Part I, Chapter 6(B)(2)(q) of the Procurement Handbook provides that "[t]he Issuing Office . . . [c]onducts pre-selection negotiations, if desired, consistent with the terms of the RFP." Finally, Part I, Chapter 6(B)(10)(e)(2)(c) of the Procurement Handbook states that "[t]he issuing office, or the evaluation committee chairperson or designee, will conduct the pre-selection negotiations."

With respect to the clarification of PHW's proposal, Section I-17 of the Reissued RFP specifically provides that "Offerors may be required to make an oral or written clarification of their proposals to the Department to ensure thorough mutual understanding and Offeror responsiveness to the solicitation requirements. *The Project Officer will initiate requests for clarification*." R.R. at 202a (emphasis added). *See also* Section I-9, *id.* at 197a ("If an Offeror has any questions regarding this RFP, the Offeror must submit the questions by email . . . to the Project Officer named in Part I, Section I-2 of the RFP.").

Likewise, Part I, Chapter 6(B)(2)(m) of the Procurement Handbook states that "[t]he Issuing Office: . . . [r]equests clarification of proposals from offerors as determined necessary to ensure responsiveness to the solicitation and thorough understanding of the proposals." Additionally, Part I, Chapter 6(B)(3)(b)(2) of the Procurement Handbook states that "[i]f clarification of a proposal is needed, [the Evaluation Committee] communicates the need for clarification to the issuing office and assists the issuing office in communicating with those offerors whose proposals need clarification." *See also* Part I, Chapter 6(B)(10)(c)(1) and (2) ("The evaluation committee may ask the issuing office to seek clarification from an offeror to assure full understanding of and responsiveness to

26

the RFP. . . . The issuing officer, on behalf of the evaluation committee, shall make all contacts with the offeror in writing.").

Finally, with respect to an inquiry into, or a determination of, whether PHW can adequately perform under the contract or is a "responsible offeror" under the Reissued RFP, Section I-23 states:

> **I-23.** *Issuing Office Participation.*
>
> * * *
>
> Prior to the enrollment of MA consumers in an MCO, the Department will conduct a readiness review. MA Consumers will not be able to enroll in a selected MCO and the Department will not enter into an agreement with the selected [MCO] until the Department determines that the MCO has satisfied the readiness review requirements. . . . At its discretion, the Department may commence monitoring before the effective or operational dates of the agreement, and before the formal Readiness Review period.

R.R. at 203a (emphasis added). *See also* Section III-5, *id.* at 228a, 229a ("To be responsible, an offeror must submit a responsive proposal and possess the capability to fully perform the agreement requirements in all respects and the integrity and reliability to assure good faith performance of the agreement. . . . [T]he Issuing Office will award an agreement only to those Offerors determined to be responsible in accordance with the most current version of Commonwealth Management Directive 215.9, Contractor Responsibility Program [(CRP).[22]]").

---

[22] Section 321(6) of the Procurement Code states that DGS shall "[p]articipate in the management and maintenance of a [CRP] in coordination with the Office of the Budget and other agencies as may be directed by the Governor." 62 Pa. C.S. §321(6). *See also* Section 327(b) of the Procurement Code, 62 Pa. C.S. §327(b) ("The Office of the Budget shall participate in the management and maintenance of a [CRP] in coordination with [DGS] and other agencies as may

Likewise, Part I, Chapter 6(B)(2)(o) of the Procurement Handbook states that "[t]he Issuing Office: . . . [m]akes a determination of offerors' responsibility in accordance with Management Directive 215.9 Amended and Part I, Chapter 14 of this handbook."[23] *See also* Part I, Chapter 6(B)(10)(e)(1)(b) of the Procurement Handbook ("In order for an offeror to participate in the [BAFO] process, the issuing office must determine that the submitted and gathered financial and other information of the offeror demonstrates that the offeror possesses the financial and technical capability, experience and qualifications to assure good faith performance of the contract.").

Based on the foregoing, it is clear that the Director erred in denying United's bid protests. The December 19th meeting between the Department's Deputy Secretary for OMAP and Deputy Chief Counsel in the Department's Office of General Counsel, and Centene's Chairman and CEO and Executive Vice President and the Chief Business Development Officer, which occurred after the bids had been opened, but before PHW was found to be a "responsible offeror" and before its proposal was determined to be responsive or the most advantageous, was not

be directed by the Governor."). Management Directive 215.9 Amended from the Governor's Office establishes the policy, responsibilities, and procedures for the operation of the CRP.

[23] Part I, Chapter 14(C)(1) of the Procurement Handbook provides:

> Since the [Procurement] Code requires award to a "responsible" bidder or offeror, purchasing agencies are explicitly required to make an affirmative determination of a bidder or offeror's responsibility prior to award. Further, purchasing agencies are required to make a responsibility determination prior to requesting a [BAFO] when the [RFP] method of procurement is utilized. Determining responsibility is an affirmative duty, and the purchasing agency may not presume that all bidders or offerors are responsible.

28

authorized by the Reissued RFP thereby violating the Procurement Code and the Procurement Handbook. *See, e.g.*, *Pepco*, 49 A.3d at 495 ("Based upon the numerous provisions of the RFP summarized above, we must conclude that the provisions of the RFP did not entitle Petitioner to engage in contract negotiations *before* the Department made a determination regarding whether Petitioner was a responsible offeror who submitted a responsive proposal or *before* the Department made a determination as to which proposal was most advantageous.") (emphasis in original).[24] As a result, the Department's order denying United's bid protests will be reversed. *See American Totalisator Co.*, 414 A.2d at 1041 ("When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper."); *Hanisco v. Township of Warminster*, 41 A.3d 116, 123 (Pa. Cmwlth. 2012) ("A deviation from competitive bidding will not be countenanced even where there is no evidence of fraud or favoritism."). *See also* Section 1711.1(j) of the Procurement Code, 62 Pa. C.S. §1711.1(j) ("[I]f the court determines that the solicitation or award of a contract is contrary to law, then

---

[24] *See also Stapleton v. Berks County*, 593 A.2d 1323, 1331 (Pa. Cmwlth. 1991) ("We recognize that the procurement process for a complex contract such as the one negotiated in this case will necessitate some procedures which are not the norm. For this reason, we do not find it objectionable that the county did not require bid or performance bonds in this case. . . . The events which transpired after the bids were opened are another matter. Private meetings and negotiations with some bidders to the exclusion of others before the contract is awarded is precisely the sort of favoritism and unfair advantage that *Harris*[ *v. Philadelphia*, 129 A. 460 (Pa. 1925)] and its progeny disdained."); *Conduit and Foundation Corp. v. City of Philadelphia*, 401 A.2d 376, 380 (Pa. Cmwlth. 1979) ("[W]e believe that the case falls, by analogy, under the line of cases raising the issue, not as to the city's discretion, but as to whether a bidder had a competitive advantage in preparing his bid because of the city's incomplete or misleading bid specifications or the city's having negotiated after the formal bid-opening.") (citations omitted).

the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract.").[25]

Accordingly, the Department's order is reversed.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[25] Based on our disposition of United's claim with respect to the Department's violation of the Reissued RFP, the Procurement Code, and the Procurement Handbook, we will not address the remaining claims in this appeal. *See, e.g., Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 529 A.2d 1176, 1178 (Pa. Cmwlth. 1987) ("As the Commission points out, our Supreme Court has held with finality that the original jurisdiction of this Court is limited in matters involving Commonwealth agencies to those actions not within our appellate jurisdiction. We conclude that Peoples' Petition clearly sets forth the matter for our appellate review; therefore, we must sustain the demurrer. [Our ruling with respect to the demurrer makes it unnecessary for us to rule upon the Commission's other objections.]") (citation omitted).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

UnitedHealthcare of
Pennsylvania, Inc.,

                       Petitioner

            v.

Department of Human Services,

                  Respondent

No. 790 C.D. 2017

# **O R D E R**

AND NOW, this 10th day of April, 2018, the order of the Department of Human Services dated June 5, 2017, denying the bid protests of UnitedHealthcare of Pennsylvania, Inc. with respect to the reissued Request for Proposal No. 06-15 is REVERSED.

_____
MICHAEL H. WOJCIK, Judge