**LANGUAGE LINE SERVICES, INC., Petitioner**

v.

**DEPARTMENT OF GENERAL SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 2010.

Decided March 5, 2010.

Reargument Denied April 28, 2010.

James W. Kutz, Harrisburg, for petitioner.

Michael C. Barrett, Senior Counsel, Harrisburg, for respondent.

Brian S. Gocial, Philadelphia, for intervenor, Language Services Associates.

BEFORE: PELLEGRINI, Judge, BUTLER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge PELLEGRINI.

Language Line Services, Inc. (Language Line) appeals from a decision of the Deputy Secretary of the Department of General Services (DGS) denying its bid protest regarding the award of the contract for RFP 34400000537 for Non–English Interpretation, Translation & Authentication Language Services. Finding no error in DGS' decision, we affirm.

On February 1, 2008, DGS issued a Request for Proposals (RFP) to procure statewide interpretation, translation, and language authentication services for Commonwealth executive agencies. The RFP listed the following criteria for selection in order of importance: technical; cost; disadvantaged business participation (DB); enterprise zone small business participation; and domestic workforce utilization. Prior to opening the proposals, the Bureau of Procurement (BOP) established the relative importance of the major evaluation criteria as follows: 50% for the technical submittal, 30% for the cost submittal, and 20% for the DB submittal.[1]

The RFP was divided into four separate lots[2] and offerors were permitted to submit proposals on one or more lots. BOP received six proposals for Lot 1—over-the-phone interpretation services, including proposals from Language Line and Language Services Associates (LSA).[3] The contract evaluation committee scored the technical proposals, the Bureau of Minority and Women Business Opportunities (BMWBO) scored the disadvantaged business submissions, and BOP then scored the cost portion and combined the offerors' subscores to determine their preliminary overall scores. All of the proposals were deemed to be responsive.

Language Line's proposal tied for first place in the cost category and tied for second in the technical proficiency category, scoring higher than LSA in both areas. However, Language Line's proposal did not include a DB submittal, one of the major categories listed in the RFP, and it received no points in this area. LSA's proposal did include a DB submittal, indicating that it employed 87 full and part-time staff members and that the 4,000 interpreters it utilized were independent contractors rather than employees. Because it employed no more than 100 employees, LSA qualified as a small disadvantaged business[4] and received 170 points for its DB submittal. LSA obtained the second highest overall score at 832.01 points and Language Line was fifth at 708.3 points.

BOP then chose to proceed to a "best and final offer" (BAFO) phase of the eval-

---

1. While all three criteria were outlined in the RFP, their relative importance was not provided to potential offerors at the time the RFP was first posted.

2. The lots were broken down as follows: Lot 1 for Over the Phone Interpretation; Lot 2 for Interpretation; Lot 3 for Translation; and Lot 4 for Translation Authentication.

3. The other four offerors who submitted proposals for Lot 1 were Quantum, Geneva Worldwide, Global Arena, and The Big Word.

4. Section 2102 of the Procurement Code defines "small business" as "[a] business in the United States which is independently owned, is not dominant in its field of operation and employs 100 or fewer employees." 62 Pa. C.S. § 2102.

uation process. Section 513(f) of the Procurement Code, 62 Pa.C.S. § 513(f), specifically allows DGS to engage in BAFO discussions with responsible offerors and provides as follows:

> As provided in the request for proposals, discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining best and final offers. Responsible offers shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals.

Offerors were on notice of DGS' intention to enter into such discussions as Section I-20 of the RFP stated, "The Issuing Office will limit any discussions to responsible Offerors (those that have submitted responsive proposals and possess the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance) whose proposals the Issuing Office has determined to be reasonably susceptible of being selected for award." (Reproduced Record at 10a).

Because Quantum, Geneva Worldwide and LSA all scored within 100 points of each other, BOP determined they were the offerors whose proposals were "reasonably susceptible of being selected" for the award and only these three offerors were allowed to proceed to the BAFO phase of the evaluation process. DGS sent all three offerors a letter inviting them to submit BAFO's and to improve their technical, cost and DB scores, offering assistance in identifying certified suppliers who may be used in their DB proposals. All three offerors submitted BAFO's and their overall scores were as follows: LSA—929.7; Geneva Worldwide—909.01; and Quantum—901.5. As the highest overall scorer in the BAFO phase, LSA was selected for

contract negotiations on Lot 1, and DGS awarded the project to LSA in June 2009.

Language Line filed a timely bid protest claiming LSA's classification of its interpreters as independent contractors rather than employees was improper and, as a result, it employed more than 100 employees making it ineligible to receive credit as a small disadvantaged business in the scoring of the RFP. Language Line also contended that the award was invalid because LSA's proposal did not meet several mandatory RFP requirements. The contract with LSA was stayed pending resolution of Language Line's protest.[5]

On August 14, 2009, DGS Deputy Secretary Anne Rung (Deputy Secretary) issued a determination denying Language Line's bid protest. She found that LSA did not exercise the degree of control over its interpreters that was required for them to be considered employees, citing the following in support of this finding:

> a) Interpreters offer a service that Language Services Associates buys as the need occurs, and interpreters are free to accept or reject any assignments;

> b) Interpreters are free to provide interpreter services to other entities while working for Language Services Associates;

> c) Interpreters determine their own schedules;

> d) Interpreters execute a written contract in which they agree to accept the engagement as an independent contractor;

> e) Interpreters are paid by the job (i.e. length of call); and

> f) Interpreters work from their own homes/offices and are not reimbursed for any costs related to their performance.

---

5. Language Line submitted a supplemental bid protest which was rejected as untimely.

(DGS Determination of August 14, 2009 at 5). Given these facts, the Deputy Secretary determined that LSA's interpreters were properly classified as independent contractors and it had only 87 employees at the time it submitted its proposal, qualifying it as a small disadvantaged business and entitled to the DB points it received in the scoring of the RFP.

■ The Deputy Secretary also found that BOP did not act arbitrarily in limiting participation in the BAFO phase to offerors whom it determined to be reasonably susceptible of being selected for award as this is specifically provided for in Section 513(f) of the Procurement Code and was published in the RFP. She found that BOP was not arbitrary in its determination that any offeror more than 100 points below the highest-scoring proposal in any lot would not be within the competitive range and would not be reasonably susceptible of being awarded the contract. Finally, the Deputy Secretary determined that the RFP established only two mandatory responsiveness requirements; that the proposal be timely submitted and properly signed, and that LSA met both of these requirements. Language Line then petitioned this Court for review.[6]

6. This Court's scope of review of a decision of the Deputy Secretary of DGS is limited to determining whether errors of law were committed, whether constitutional rights were violated, and whether necessary findings of fact were supported by substantial evidence. *Perry Construction Group, Inc. v. Department of General Services*, 863 A.2d 619 (Pa.Cmwlth. 2004).

7. Language Line argues that we should utilize the federal "economic reality" standard outlined in *Commonwealth of Pennsylvania v. Stuber*, 822 A.2d 870 (Pa.Cmwlth.2003), to determine whether LSA's interpreters were properly classified as independent contractors. Under the "economic reality" test, the relevant considerations are as follows:

## I.

### A.

■ Language Line's main argument on appeal is that the Deputy Secretary erred in determining LSA's interpreters were independent contractors and not employees. This Court and the Pennsylvania Supreme Court have analyzed the difference between employees and independent contractors in several different contexts. While there are minor differences in the application of the tests in different contexts, the tests themselves are similar.[7] In *Hammermill Paper Company v. Rust*, 430 Pa. 365, 243 A.2d 389 (1968), and *Zimmerman v. Commonwealth of Pennsylvania*, 513 Pa. 560, 522 A.2d 43 (1987), our Supreme Court set forth the factors to be used to determine whether a person was an employee as follows:

Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer;

1) the degree of control exercised by the employer over the workers;
2) the worker's opportunity for profit or loss depending upon managerial skill;
3) the alleged worker's investment in equipment or material required for the tasks or the employment of helpers;
4) whether the service rendered requires special skill;
5) the degree of permanence of the working relationship; and
6) the extent to which the work is an integral part of the employer's business.

As can be seen the tests are very similar and the result would be the same under the test that our Supreme Court enunciated in *Hammermill Paper Company*.

and also the right to terminate the employment at any time.

No one factor is dispositive of the issue and each case must be determined on its own facts and circumstances. *Zimmerman,* 513 Pa. at 563, 522 A.2d at 45. Moreover, written agreements stating that a person is hired as an independent contractor is relevant but not dispositive.

Language Line contends that LSA exercises control over its interpreters because it has control over resources, timelines, budget and quality of work. In a similar case, *CE Credits OnLine v. Unemployment Compensation Board of Review,* 946 A.2d 1162 (Pa.Cmwlth.2008), we examined the level of control necessary to make a person an employee rather than an independent contractor. In that case, the person was a moderator of an online education service. She was required to successfully complete an online course to qualify for the position, pass a course entitled "Stopping Disruptive Behavior" and took other online courses making her eligible to moderate six different courses. She was issued the above-described written materials relevant to moderating CEC student work, but she did not undergo any other formal training. The employer expected that person to use good grammar, did occasional spelling checks of responses and expected responses to be consistent with CEC's rubrics. Claimant did not receive a performance evaluation, a guarantee for a certain level of annual compensation, or a guarantee that she would receive a minimum number of posting assignments.

▮ We held that there is a "difference between control of a work product and control over the time, place and manner of performance." As this Court explained in *J. Miller Co. v. Mixter,* 2 Pa.Cmwlth. 229, 277 A.2d 867, 871 (1971), "control of the result only and not of the means of accomplishment" did not transform an independent contractor relationship into an employer-employee relationship. Every job, whether performed by an employee or by an independent contractor, has parameters and expectations. "Control ... is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment." *Id.* at 1169.

▮ In this case, LSA provides its interpreters with training, a computer tracking system and study materials. Interpreters are regularly evaluated and they must comply with LSA's code of ethics. While LSA does provide evaluations and controls the quality of the final work product, it does not control the means of its accomplishment. Interpreters determine their own schedules, work out of their homes, and are not reimbursed for expenses. Interpreters are also paid by the job, have the authority to decline a particular job, and they alone are responsible for the satisfactory completion of their assignments. While providing over-the-phone interpretation services is a key part of LSA's regular business, interpreters are free to provide such services to other entities, even to LSA's direct competitors. LSA simply buys the services it needs from any number of its interpreters on an as-needed basis. This freedom to accept or reject any particular job or to work for another company in the interpretation industry seems to indicate that the interpreters' relationship with LSA is not that of permanent employees, but independent contractors. Based on these facts, we do not find that the Deputy Secretary's finding that LSA's interpreters were independent contractors was erroneous.

### B.

▮ Language Line also argues that even if its interpreters qualify as indepen-

dent contractors, LSA now employs more than 100 people and therefore does not qualify as a small disadvantaged business. After submitting its proposal in this case but before DGS made its final award decision, LSA submitted a proposal in Iowa for similar interpretation services in which it admitted that it had more than 100 employees. LSA did not update its status during the time period the RFP was being considered, nor did it confirm its small business status at the time it submitted its BAFO. According to Language Line, the size of LSA's staff at the time the contract was actually awarded is the key inquiry, not merely whether it qualified as a small disadvantaged business at the time its proposal was submitted. Because LSA did not maintain its status as a small disadvantaged business at the time the contract was awarded, Language Line asserts that it should not have received the benefit of the DB points in the scoring process.

However, the standard Language Line proposes is not workable and could severely disrupt or delay the awarding of contracts in the Commonwealth. During the months it takes to go from posting an RFP to awarding a contract with the Commonwealth, the workforce of an offeror's company can change dramatically and can potentially rise above and fall below 100 employees several times. A bright-line rule is needed to determine whether offerors qualify as small disadvantaged businesses; therefore the key inquiry must be whether offerors have fewer than 100 employees at the time they submit their initial proposals. To require offerors to update DGS every time their employment status fluctuates and to require DGS to continuously update DB status and therefore re-score proposals constantly throughout the RFP process is neither practical nor efficient. Because LSA had only 87 employees when it submitted its initial proposal, DGS properly determined

that it qualified for small disadvantaged business status in the scoring of the proposals.

## II.

■ Language Line also argues that the procedure utilized by DGS to award the contract to LSA violated the Procurement Code and undermined the fundamental principles governing public contracting. Section 513 of the Procurement Code states that an agency can conduct discussions with responsible offerors during the RFP process in order to obtain BAFO's and that "[r]esponsible offers shall be accorded fair and equal treatment." According to Language Line, the requirement of "fair and equal treatment" means that all responsible offerors must be accorded the same opportunity; therefore DGS was required to accept BAFO's from all responsible offerors or none of them. Because DGS chose to only allow the top three offerors the opportunity to submit BAFO's, Language Line claims it violated Section 513 of the Procurement Code and the contract award is, therefore, invalid.

However, Language Line misinterprets the language of Section 513. That section states that responsible offers must be given "fair and equal treatment" with respect to BAFO discussions, not that they all must be given the opportunity to negotiate after submitting their initial proposals. All of the initial proposals received by DGS in this case were scored by the same entities based upon the exact same criteria. Language Line knew the five criteria for selection and their order or importance before submitting its proposal, just like all the other offerors and they were all on equal footing and received fair and equal treatment. If the General Assembly had intended that all offerors must be given

the chance to submit a BAFO, it would have specifically stated this in Section 513.

Section 513 allows DGS the opportunity to enter into discussions and negotiations with responsible offerors "[a]s provided in the request for proposals." The RFP at issue in this case specifically stated and put offerors on notice that DGS was reserving the right to limit BAFO discussions to responsible offerors whose proposals were considered "reasonably susceptible of being selected for award." The top three proposals all scored within 100 points of each other and were therefore given the opportunity to proceed to the BAFO phase. Language Line's overall score was fifth out of six, it failed to address one of the major criteria listed in the RFP, and its proposal scored almost 175 points less than the highest score. DGS properly determined that Language Line could not make up such a deficit and therefore its proposal was not "reasonably susceptible of being selected for award." It was Language Line's own failure to include a DB submittal with its proposal which cost it the potential award of this contract, not any violation of the Procurement Code by DGS in the scoring of the proposals.

### III.

■ Finally, Language Line argues that DGS erred in awarding the contract to LSA when its proposal failed to meet several nonwaivable requirements set forth in the RFP. Specifically, Language Line alleges that LSA's proposed program manager did not have the required minimum experience, LSA failed to identify its customer service personnel or demonstrate that they had the required experience, and it failed to provide information directly requested by the RFP. However, there were only two mandatory responsiveness requirements in the RFP at issue—timeliness of receipt and proper signature execution. LSA met both of these requirements. Our Supreme Court has noted that imperatives in bid documents are not necessarily dispositive of materiality. *Gaeta v. Ridley School District,* 567 Pa. 500, 788 A.2d 363 (2002). Therefore, even if the RFP in this case indicated that a proposed program manager "must" have a certain level of experience, such language would not necessarily make this requirement material or nonwaivable. None of the issues Language Line raises amount to mandatory requirements and none were indicated as such in the RFP. In addition, none of these issues would rise to the level of a competitive advantage requiring bid rejection or invalidation of the contract.

For all of the above reasons, the decision of the Deputy Secretary of DGS denying Language Line's bid protest is hereby affirmed.

### ORDER

AND NOW, this *5th* day of *March,* 2010, the decision of the Deputy Secretary of the Department of General Services dated August 14, 2009, is hereby affirmed.