# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

KPMG LLP,                 :
            Petitioner        :
                           :    No. 491 C.D. 2021
         v.                   :
                           :    Argued: March 10, 2022
Commonwealth of Pennsylvania,   :
Department of Human Services,    :
            Respondent     :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY
JUDGE McCULLOUGH                    FILED: May 2, 2022

KPMG LLP (Petitioner) petitions for review from the April 23, 2021 final order and determination of the Commonwealth of Pennsylvania, Department of Human Services (Department), which denied its bid protest and supplemental bid protest. Upon review, we affirm.

## I. Background

On May 1, 2020, the Department issued Request for Proposal No. 12-18 (RFP) seeking proposals for comprehensive business planning services to support a range of activities within the Information Technology (IT) program project delivery services for the Department. The RFP divided the scope of the work into two lots: (1) Business Planning and Business Architecture Services for program offices responsible for Eligibility and Enrollment, Child Welfare, Child Care and Early Learning, and

Medical Assistance Waiver Populations (Lot 1); and (2) Business Planning and Business Architecture Services for the program office responsible for Child Support Enforcement. With respect to Lot 1, the Department received two proposals—one from Petitioner, and one from Public Consulting Group, Inc. (PCG). In its proposal, Petitioner proposed a solution which projected that it would require over 553,236 work hours over the contract's five-year duration, at a total proposed cost of $17,566,204.22 per year, and included a list of multiple project managers for the project. In contrast, PCG proposed a solution with a total proposed cost of $10,425,302.00 per year. However, PCG's proposal did not include an estimate for the total number of work hours needed to fulfill the requirements of the project and, further, arguably did not include a complete list of project managers for the project. (Findings of Fact (F.F.) at Nos. 1-2; Final Determination at 1.)[1]

> According to the RFP, and procedural history of this case,
>
> 3. To be eligible for selection, the proposal had to be timely received from an offeror and properly signed by the offeror.
>
> 4. These two mandatory responsiveness requirements were the only RFP requirements that were non-waivable.
>
> 5. The Department had sole discretion to waive any other technical or immaterial nonconformities, allow an offeror to cure a nonconformity, or consider the nonconformity in scoring the offeror's proposal.
>
> 6. The Department established three evaluation criteria to be used in evaluating each proposal: (1) technical, weighted at 50% of the total points; (2) cost, weighted at 30% of the total points; and (3) small diverse business and small

---

[1] In short, these two omissions on the part of PCG in completing its proposal under the RFP constitute the gist of the dispute presently before the Court.

business ([]SOB/SB[]) participation, weighted at 20% of the total points.

7. Bonus points of up to 3% of the total points were also available for domestic workforce utilization.

8. The RFP provided that evaluation of the technical criterion was based upon soundness of approach, contractor qualifications, personnel qualifications, and understanding the project.

9. To be responsible, an offeror was required to submit a responsive proposal and possess the capability to fully perform the contract requirements in all respects and the integrity and reliability for the good faith performance of the contract.

10. To be considered responsible and eligible for selection, an offeror had to achieve a total raw technical score of greater than or equal to 75% of the available raw technical points and possess the financial capability to ensure good faith performance of the contract.

11. The RFP allowed the Department to obtain Best and Final Offers ([]BAFOs[]).

12. The RFP provided that the Department would select the offeror whose proposal was determined to be the most advantageous to the Commonwealth after taking into consideration all of the evaluation factors.

13. The Department received two proposals for Lot 1[—*i.e.*, one from Petitioner and one from PCG].

14. The proposals were evaluated by an evaluation committee consisting of agency representatives from the Department's Offices of Income Maintenance; Long-Term Living; Child Development and Early Learning; Children, Youth and Families; and Medical Assistance Programs; as well as the Governor's Office of Administration Health and Human Services Delivery Center.

15. Both proposals received at least 75% of the available raw technical points to be considered for selection for BAFOs or contract negotiations.

16. Both offerors were selected to proceed to the BAFO phase of the evaluation process for Lot 1.

17. The Department requested a cost BAFO from each offeror and both offerors provided BAFO responses.

18. After the BAFO phase, the Department combined the final technical score, SOB/SB participation score, cost score, and domestic workforce utilization bonus points in accordance with the weights in the RFP and determined that PCG received the highest overall score.

19. PCG's proposal was determined to the most advantageous to the Commonwealth and PCG was recommended for selection for contract negotiations.

(F.F. Nos. 3-19.)

On January 29, 2021, the Department awarded PCG the contract, and Petitioner was "notified" of this fact on that same date. *See* Final Determination at 11-14. On February 5, 2021, Petitioner filed a bid protest challenging the Department's decision not to select it for contract negotiations under the RFP. On February 11, 2021, Petitioner filed a second or "supplemental" protest. In turn, PCG, the Department, and the Governor's Office of Administration Health and Human Services Delivery Center filed responses to the protests, and, on March 29, 2021, the two protests were consolidated for purposes of issuing a final administrative determination. (Final Determination at 1.)

In a final agency determination dated April 23, 2021, the Department's Bureau Director, Tina L. Long (Director), rejected the claims raised in Petitioner's first bid protest that: (1) PCG's proposal was not responsive and was improperly evaluated, (2) PCG's labor hour breakdown for the "Knowledge Transfer" and "Transition Task"

was inaccurate, (3) PCG lacked appreciation for the scope of the work required by the RFP, (4) PCG should have received a lower technical score, and (5) PCG's cost proposal was unrealistically low.

As to Petitioner's supplemental bid protest, the Director found that this protest was untimely filed per section 1711.1(b) of the Commonwealth Procurement Code (Procurement Code),[2] 62 Pa.C.S. §1711.1(b), which provides, in part, that protests must be filed no later than seven days after a contract is awarded.[3] Even if this bid protest had been filed timely, the Director determined that the following claims of Petitioner were without merit: (1) PCG failed to include the required "Project Managers" in its proposal, (2) PCG's proposal failed to include references to the work products required under the Knowledge Transfer and Transition Task, (3) PCG's proposal failed to describe how it will perform work order estimate reviews, and (4)

---

[2] 62 Pa.C.S. §§101-2311.

[3] In full, this statutory section provides as follows:

> If the protestant is a bidder or offeror or a prospective contractor, the protest shall be filed with the head of the purchasing agency within seven days after the aggrieved bidder or offeror or prospective contractor knew or should have known of the facts giving rise to the protest *except that in no event may a protest be filed later than seven days after the date the contract was awarded.* If the protestant is a prospective bidder or offeror, a protest shall be filed with the head of the purchasing agency prior to the bid opening time or the proposal receipt date. If a bidder or offeror, a prospective bidder or offeror or a prospective contractor fails to file a protest or files an untimely protest, the bidder or offeror, the prospective bidder or offeror or the prospective contractor shall be deemed to have waived its right to protest the solicitation or award of the contract in any forum. *Untimely filed protests shall be disregarded by the purchasing agency.*

62 Pa.C.S. §1711.1(b) (emphasis added).

PCG failed to propose sufficient personnel. Accordingly, the Director denied Petitioner's bid protests.

On May 10, 2021, Petitioner filed a petition for review with this Court.[4] On May 11, 2021, Petitioner filed an application for a stay, which the Court denied on July 16, 2021.

## II. Discussion

In relevant part, the RFP asked (1) offerors to "describe in narrative form the technical plan for accomplishing [] Lot 1 [p]roject work" and "*[p]rovide the number of labor hours allocated to each task*." (Reproduced Record (R.R.) at 105a) (emphasis added). In addition, the RFP directed that (2) offerors propose one overall "Project Manager," dedicated as "Key Personnel," who would be "responsible and accountable for controlling and monitoring all phases of projects being planned or executed," and, further instructed that "[t]he Lot 1 selected [o]fferor *must provide project managers across all Lot 1 lines of business* who will assess changes, risks, and issues relative to the predefined schedule, performance, and budget." (R.R. at 120a) (emphasis added).

Here, in its proposal, PCG did not include a complete breakdown of labor hours needed for each task within Lot 1. Arguably, PCG also did not provide a complete listing of all the necessary "project managers" in its proposal.

---

[4] This Court's scope of review of the Director's final determination is limited to considering "whether the determination of the [Department] [was] arbitrary and capricious, an abuse of discretion or contrary to law." *JPay, Inc. v. Department of Corrections*, 89 A.3d 756, 761 n.2 (Pa. Cmwlth. 2014).

**A. The Labor Hours and Project Manager Portions of the RFP were Waivable by the Department *Per Se***

Before the Director, Petitioner asserted that the Department could not award PCG the contract because PCG failed to provide the complete number of labor hours needed to complete each task with the project for Lot 1 and, thus, its proposal was fatally "non-responsive."

In rejecting this argument, the Director reasoned, in part:

> In its proposal, PCG included labor hours for the Knowledge Transfer and Transition Task, but not the other tasks. However, the inclusion of the labor hours for each of the tasks in the RFP was not a mandatory requirement for a proposal to be deemed responsive. *The RFP explicitly stated only two mandatory requirements for a proposal to be deemed responsive: the proposal had to be timely received and properly signed by the offeror. All other RFP requirements were waivable.* The RFP gave the Department sole discretion to waive any other technical or immaterial nonconformities, allow the offeror to cure a nonconformity, or consider the nonconformity in scoring the offeror's proposal.
>
> By the terms of the RFP, the Department had discretion to waive the nonconformity in PCG's proposal or consider that nonconformity in the scoring. The failure to include labor hours did not render PCG's proposal non-responsive to the RFP, as PCG met the RFP's two mandatory responsiveness requirements.

(Final Determination at 5) (emphasis added).

Albeit in its second or "supplemental protest," Petitioner also asserted that the Department could not award PCG the contract because PCG failed to comply with the RFP's directive to list project managers for each of the lines of business under Lot 1 and, thus, its proposal was fatally "non-responsive."

In finding that this contention lacked merit, the Director, in part, provided the following rationale:

> PCG complied with the RFP's requirements by naming an individual for each Key Personnel position listed, including a Project Manager. *Contrary to [Petitioner's] argument, the RFP did not require an offeror to identify the project managers across all Lot 1 lines of business, but merely stated that such a position would be required. Further, as set forth above, the RFP included only two mandatory requirements and any other noncompliance could be waived, cured, or considered in scoring at the Department's sole discretion.*

*Id.* at 9 (emphasis added).

Here, regardless of any surface appeal that Petitioner's arguments (as reproduced above and below) may have, this Court's decisional law supports the proposition that the Department has discretion to decide which criteria are "mandatory," and which criteria are waivable, in an RFP. In *Language Line Services, Inc. v. Department of General Services*, 991 A.2d 383 (Pa. Cmwlth. 2010), this Court reviewed arguments that are substantially similar to those made by Petitioner here and concluded:

> [The rejected bidder (RB)] argues that [the agency] erred in awarding the contract to [the successful bidder (SB)] when its proposal failed to meet several nonwaivable requirements set forth in the RFP. Specifically, [the RB] alleges that [the] proposed program manager did not have the required minimum experience, [the SB] failed to identify its customer service personnel or demonstrate that they had the required experience, and it failed to provide information directly requested by the RFP. *However, there were only two mandatory responsiveness requirements in the RFP at issue—timeliness of receipt and proper signature execution. [The SB] met both of these requirements.* Our Supreme Court has noted that imperatives in bid documents are not necessarily dispositive of materiality. Therefore, even if the

8

RFP in this case indicated that a proposed program manager "must" have a certain level of experience, such language would not necessarily make this requirement material or nonwaivable. *None of the issues [the RB] raises amount to mandatory requirements and none were indicated as such in the RFP*.

*Id.* at 390 (emphasis added; internal citation omitted); *accord JPay, Inc. v. Department of Corrections*, 89 A.3d 756, 766-67 (Pa. Cmwlth. 2014).

Akin to the circumstances in *Language Line Services, Inc.*, where the RFP stated that timely receipt and proper signature execution of the proposal were the only two mandatory requirements, and the successful bidder complied with both of them, here, PCG met the two mandatory responsiveness requirements, as stated in the RFP itself—*i.e.*, the proposal had to be timely received and properly signed by the offeror. Consequently, in accordance with the plain language of the RFP, PCG's failure to include a complete breakdown of labor hours and (arguably) a complete listing of all "project managers" was waivable by the Department *per se*. Following our decision in *Language Line Services, Inc.*, we therefore conclude that the Director did not err in determining that the Department did not engage in arbitrary or capricious conduct, or otherwise commit legal error, in awarding the contract to the PCG.[5]

---

[5] As an additional ground for affirmance with respect to the "project manager" issue, we conclude that, based on the plain language of the RFP, PCG properly listed the overall "project manager," and the RFP did not require PCG to denote, at the time of its proposal, all of the subordinate "project managers" for each line of business within Lot 1. Instead, the RFP merely required the successful bidder to supply such "project managers" in the event the bidder was awarded the contract and as a post-execution obligation of that contract. *See* R.R. at 120a (stating that "[t]he Lot 1 *selected* [o]fferor *must provide project managers across all Lot 1 lines of business* who will assess changes, risks, and issues relative to the predefined schedule, performance, and budget") (emphasis added). Thus, consistent with the unambiguous terms of the RFP, PCG satisfied the requirement of the RFP with respect to the "project manager" issue.

Further, the Director concluded that the "project manager" issue was waived because Petitioner failed to raise it in a timely fashion, reasoning as follows:

**(Footnote continued on next page…)**

9

> The Procurement Code states that an offeror shall file a protest within seven days after it knew or should have known of the facts giving rise to the protest "except that in no event may a protest be filed later than seven days after the date the contract was awarded." 62 Pa.C.S. §1711.1(b). "Untimely protests shall be disregarded by the purchasing agency." *Id.*
>
> Here, [Petitioner] acknowledges that it was notified of the contract award and received a debriefing and Recommendation for Contractor Selection memorandum on January 29, 2021. Nonetheless, [Petitioner] argues its [s]econd [p]rotest should be accepted because the Department provided the contract to [Petitioner] on February 4, 2021. The Department provided a copy of the contract to [Petitioner] as soon as practicable and [Petitioner] has failed to demonstrate any bad faith on behalf of the Department. Although [Petitioner] relies on the Procurement Handbook as support for its claim that the Department should have provided it with the contract sooner, the Department complied with the Procurement Handbook by notifying [Petitioner] in writing of the award and opportunity for debriefing.
>
> Moreover, . . . [n]o time frame exists within which the Department is required to provide a copy of the awarded contract to a disappointed offeror. As such, the Department did not act improperly by providing the contract to [Petitioner] on February 4, 2021, and [Petitioner's] [s]econd [p]rotest is untimely because it was filed on February 11, 2021, more than seven days after the contract was awarded.

(Final Determination at 9) (internal citations omitted). We agree. Because Petitioner raised this issue more than seven days after the contract was awarded, in a second or supplemental protest, the issue is untimely and waived. *See Premier Comp Solutions, LLC v. Department of General Services*, 949 A.2d 381, 384-85 (Pa. Cmwlth. 2008) (noting that pursuant to section 1711.1(b) of the Procurement Code, a "prospective contractor" was required to challenge the contract within seven days of the award of the contract and concluding that the prospective contractor waived any protest to the contract, even when "it was impossible for it to file [a protest] within seven days after the date the contract was awarded because it was unaware that the award was made for at least three months"). Notably, Petitioner could have raised the "project manager" issue in a timely manner in its first protest because, at that point in time, Petitioner had express knowledge that PCG did not provide a listing for all the personnel that Petitioner believed was required by the RFP, and the terms of the actual contract that was awarded to PCG does not negate or otherwise question this knowledge.

10

**B. Alternatively, the Labor Hours and Project Manager Portions of the RFP were Waivable by the Department Pursuant to *Gaeta v. Ridley School District*, 788 A.2d 363 (Pa. 2002)**

Here, even if the labor hours and project manager information requested by the RFP were mandatory requirements, we would nonetheless conclude that these requirements were waivable by the Department based on our Supreme Court's decision in *Gaeta*.

Traditionally, under Pennsylvania law, if a term or condition in an RFP is "mandatory," a bidder or offeror must strictly adhere to the requirement in order to be awarded a public contract. *See Dragani v. Borough of Ambler*, 37 A.3d 27, 31 (Pa. Cmwlth. 2012). Although the failure to include "mandatory," requisite information in an RFP generally disqualifies an offeror from an award of a contract,

> courts have not eliminated the discretionary aspect of executive decision making when the government is confronted with a non-compliant bid that it might choose to consider to achieve effective utilization of the public fisc. In describing the available latitude, conceptions of materiality and competitive advantage have been utilized, both of which [] are closely tied to the legislative objectives underlying competitive bidding statutes. Accordingly, the following two considerations are widely accepted as central in determining whether a non-compliant bid for public work may be accepted or cured:
>
> first, whether the effect of a waiver would be to deprive the municipality of its assurance that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary standard of competition.

*Gaeta*, 788 A.2d at 367-68 (internal citations omitted).

11

In *Gaeta*, our Supreme Court determined that the above "formulation represents an apt synthesis of prevailing Pennsylvania precedent on the assessment of the availability of waiver and cure in the public works setting," and it adopted such test as the basis for determining whether a proposal is fatally defective or, in other words, "non-responsive." *Id.* at 368. Stated somewhat differently, "a bid irregularity may only be clarified or disregarded as a waivable defect if the effect of a waiver of that term: (1) would not deprive the bid solicitor of an adequate assurance that the contract would be performed according to its specified requirements and (2) would not advantage the bidder over the other bidders." *Cardiac Science, Inc. v. Department of General Services*, 808 A.2d 1029, 1034 (Pa. Cmwlth. 2002).

## 1. Labor Hours

Here, regarding the labor hours issue, the Director disposed of Petitioner's arguments as follows:

> [A]lthough PCG may not have provided the specific breakdown of labor hours for the other tasks, PCG included detailed information regarding its experience and planned approach for the work to be performed pursuant to the RFP, including information on each resource for each functional area of the RFP. From this information and PCG's proposal as a whole, the Department was able to ensure the contract would be adequately staffed to perform the requirements of the RFP.
>
> PCG's failure to include this information did not prevent the Department from performing a fair evaluation of the two proposals. The Department evaluated the proposals in accordance with the evaluation factors set forth in the RFP, including soundness of approach, contractor and personnel qualifications, and understanding the project. It is axiomatic that each offeror will include differing information within its proposal. Contrary to [Petitioner's] claim, this does not

12

prevent the Department from conducting a fair evaluation, as the proposals are scored using the same evaluation criteria, which ensures the Department conducts an objective evaluation.

[Petitioner] has also failed to satisfy its burden of demonstrating that PCG's failure to include labor hour breakdowns conferred a competitive advantage on PCG. *See Gaeta* [], 788 A.2d [at] 366 []. [Petitioner] obtained a higher technical score than PCG, demonstrating that PCG did not receive any advantage by not including the labor hour breakdowns. For these reasons, [Petitioner] has failed to satisfy its burden of demonstrating that PCG's proposal was non-responsive and was improperly evaluated by the Department and this claim is without merit.

(Final Determination at 5-6) (internal citations omitted).

In dismissing Petitioner's related argument that, due to PCG's failure to include a labor hour breakdown for all the required tasks, the Department could not determine whether PCG's proposed Full Time Equivalents (FTEs) could realistically accomplish those tasks, the Director opined, in part:

The RFP did not require a specific level of staffing. In fact, in response to a question regarding the current staffing levels, the Department advised that "current staffing levels do not reflect the services required by the RFP. Offerors must propose the level of effort necessary to achieve the requirements of the RFP." . . .

[Petitioner's] decision to propose a higher number of FTEs than PCG does not lead to the conclusion that PCG's proposed staffing is unrealistic. . . . [Petitioner] cannot replace its judgment for that of the Department and . . . I am barred from conducting a post-selection reweighing of the proposals. The evaluation committee had discretion to review PCG's overall submission, including its staffing levels, and could determine from the information presented that PCG was capable of providing the services sought by the RFP. This decision cannot be overturned unless it was clearly erroneous, arbitrary, capricious, or contrary to law

and [Petitioner] has failed to satisfy its burden of meeting that standard here.

(Final Determination at 6-7.)

In its appellate brief before this Court, Petitioner seeks to impugn the Director's rationale, arguing that the Department's acceptance and evaluation of PCG's non-responsive proposal prevented a fair evaluation of the proposals. More specifically, Petitioner asserts that it submitted a complete responsive offer, while PCG did not, and, for support, provides charts detailing its projected hours for the specific tasks in the proposal vis-à-vis PCG. *See* Pet'r's Br. at 22-23, 25. From this, Petitioner states that "whereas [Petitioner's] proposal included a labor hour breakdown for all tasks, totaling 545,618 hours, to substantiate the assumptions underlying its proposed approach using an average of 62 FTEs," "PCG[]'s proposal only included a labor hour breakdown for only one task, totaling 11,820 hours, and failed to provide evaluators with the quantifiable support required by the RFP to justify the use of only 42 FTEs." *Id.* at 28. Petitioner asserts that "PCG[] provided no labor hours for the actual work requested in the RFP" and, instead, "provided hours only for transition activities, which is at the most for the first six months of a five-year contract." *Id.* at 28-29.

Further, Petitioner contends that, "[w]ithout the required labor hour breakdown, [the Department] was unable to determine if PCG[] could actually perform the work promised for the price proposed," and "the omission of a labor hour breakdown by PCG[] deprived the [Department] of the ability to determine if PCG[] possessed an adequate understanding of the project and proposed adequate staff to meet all requirements." *Id.* at 26. In this vein, Petitioner maintains that, "while a technical evaluator reviewing [its] labor hour breakout—at the task and subtask level—could draw a conclusion regarding [Petitioner's] understanding of each discrete requirement and whether [its] staffing assumptions were reasonable, that same evaluator could *not*

14

draw the same conclusion in regards to PCG[]'s proposal simply because the hours *were not there*." *Id.* at 29 (emphasis in original). Petitioner posits that, therefore, "[a]ny conclusion [by the Department] regarding PCG[]'s understanding of the number of hours it would take to perform the subtasks would be inherently speculative." *Id.* at 29 (emphasis in original).

Somewhat relatedly, Petitioner claims that PCG's failure to provide the necessary labor hours breakdown deprived the Department of reasonable assurances that it could perform the contract and afforded PCG a competitive advantage; thus, the omission could not be waivable pursuant to *Gaeta*. In this regard, Petitioner contends that "[h]ad [Petitioner] known that it was not required to justify its staffing model, coupled with a metric tied to the reasonable scope of the work, it too could have proposed to the [Department] a low price unconnected to its proposed labor hours," and ultimately provided "a lower bid to the [Department]," while, on the other hand, PCG's "[c]oncealment of its labor hour breakdown allowed [it] to submit a low-cost proposal unchecked by any realism." *Id.* at 40, 42. In addition, Petitioner argues that "[it] was prejudiced because PCG[]'s technical proposal was scored higher than it should have been," and that had the Department "properly evaluated PCG[]'s submission, [] PCG[]'s technical score, if not deemed non-responsive, should have at a minimum been much reduced," thereby providing PCG with "a direct and plain competitive advantage." *Id.* at 41.

In its brief, intervenor PCG, emphasizing its "extensive proposal, spanning more than 1,000 pages," *id.* at 6, argues that, even if the breakdown of hours was a mandatory requirement, the Department properly determined that it was waivable under *Gaeta*. In so doing, PCG reiterates the Director's findings that the

15

Department had adequate assurances that PCG would fully and satisfactorily perform the contract, and, additionally contends that

> [Petitioner] does nothing more than disagree with the Department's conclusion, but the Department's conclusion was reasonable and is entitled to deference.  PCG's proposal contained more than 250 pages (plus appendices with work samples and work plans) in response to the "Tasks" section of the RFP.  PCG specifically described how each of the required tasks would be performed . . . .
>
> Nor was the Department in the dark about the level of staffing that PCG believed to be necessary. PCG proposed to use 41.86 full-time employees, which amounts to more than 435,000 labor-hours over the five-year term of the contract. PCG also provided the Department with a labor hours breakdown, albeit by position rather than task.  There, PCG identified the number of expected hours worked for each position and for each year of the contract term and each option year.
>
> Ultimately, however—and as the Department rightly concluded—PCG's hours estimates were immaterial because the contract is a fixed-price contract, and PCG is obligated to complete the specified work for a fixed price regardless of the number of hours required.

Intervenor's Br. at 27-28.

For its part, the Department largely echoes the arguments of PCG and adds that, with respect to the tasks for Lot 1, its "needs are highly variable from year to year" and that "for many tasks, the number of labor hours is unknown." (Resp't's Br. at 33.) According to the Department:  "For example, the number of hours for the Defect Analysis and Resolution Support task is unknown because the very existence of such defects and their nature and scope are unknown." *Id.*

Here, assuming, *arguendo*, the labor hours criteria was mandatory, the Department, acting pursuant to *Gaeta*, could waive PCG's omission if the effect of the

16

waiver would not deprive the Department of the assurance that the contract would be entered and performed by PCG, and the waiver would not confer a competitive advantage on PCG when compared to Petitioner. For the reasons set forth above in the Director's final determination and the arguments made by the Department and PCG, we conclude that the omission does not tend to undermine PCG's promise to perform the contract or that PCG obtained an unfair competitive advantage. Particularly, as detailed by the Director, PCG, and the Department, PCG provided lengthy documentation that sufficiently outlined and explained its planned approach to accomplish the "tasks" section of the project, the level of effort necessary to complete the specified requirements of the project, the number of projected employees by position and total amount of labor hours for each employee by position. Moreover, given the nature of the project, the total amount of labor hours was inherently indeterminable, in the sense of mathematical precision and, hence, an estimated amount of total labor hours needed to fulfill the contract was naturally speculative, necessitating an exercise of business judgment and prediction on the part of Petitioner and PCG. Although Petitioner may have proposed a lesser amount of total labor hours and average FTEs than PCG, and projected hours for more discrete classes of work tasks than PCG, this does not equate to PCG having received an unfair advantage. Indeed, of the two proposals, Petitioner's proposal obtained a higher technical score, which subsumed an evaluation of projected labor hours; Petitioner proceeded to the BAFO phase and submitted a cost BAFO; and, most importantly, PCG is bound by the overall contract price, regardless of how many hours it would actually take in the future to fulfill the obligations of the contract. Standing alone, the fact that Petitioner bid a higher yearly and total price for the five-year fixed-term contract does not demonstrate any impropriety in the bidding process or by the Department in assessing the proposals.

17

Therefore, we conclude that PCG provided the Department with adequate information upon which the Department could be assured that PCG would perform the contract according to the RFP's specified requirements and that PCG did not obtain an unfair competitive advantage. As such, the Director did not err in determining that the Department did not engage in arbitrary or capricious conduct, or otherwise commit legal error, in awarding the contract to PCG.

## 2. Project Managers

Here, the Director concluded that, notwithstanding its determination that Petitioner waived the "project managers" issue and that PCG fully complied with the plain language and requirements of the RFP, *see supra* note 5, Petitioner's arguments failed on the merits. In so determining, the Director proffered the following rationale:

> As to Project Management, the RFP stated, "[t]he Lot 1 selected Offeror must provide project managers across all Lot 1 lines of business who will assess changes, risks, and issues relative to, the predefined schedule, performance, and budget." The RFP also instructed offerors to include the names and resume or education and experience for Key Personnel, which included the following: Executive Account Director, Project Manager, Requirements Manager, Quality Assurance/Quality Control Manager, Functional Lead, Testing Manager, and Training Manager. The names of non-Key Personnel were only required if available.
>
> . . . .
>
> Moreover, since the RFP did not require an offeror to identify the project managers across all Lot 1 lines of business, PCG could not have obtained a competitive advantage by not including such information. Concomitantly, [Petitioner's] decision to include a project manager for each line of business, which it argues resulted in it proposing a higher cost, did not put it at an unfair disadvantage.

(Final Determination at 9-10.)

18

In its appellate brief, Petitioner asserts that it submitted a complete responsive offer, and PCG did not, and, therefore, the Department erred in awarding the contract to Petitioner. With respect "to the project managers for the Lines of Business," Petitioner argues that "PCG[] proposed only an overarching Project Manager, failing to propose dedicated project managers for each of the four Lines of Business under Lot 1 as required by the RFP." (Pet'r's Br. at 28.) Petitioner maintains that "[t]his was not simply an omission on an organizational chart" because "[i]nclusion of these additional project managers . . . increased [Petitioner's] price in excess of $7 million, accounting for roughly 9.15% of its bid price." *Id.* Petitioner argues that, "without proposing the required Line of Business project managers, the [Department] was unable to discern that PCG[] proposed the required (let alone sufficient) staff to ensure that tasks were managed and completed in accordance with the requirements of the contract." *Id.* at 33-34.

In asserting PCG's omitted information that was not waivable per *Gaeta*, Petitioner continues:

> With regard to the missing project managers, PCG[] identified only a single lead Project Manager [but] failed to propose a project manager position overseeing any of the Lines of Business; this omission meant that there is no one within the PCG[] organization who has dedicated responsibility to assess changes, risks, and issues relative to the predefined schedule, performance, and budget for each line of business, as is required. Without this required role, the [Department] ha[d] no single point of contact within each Line of Business and would have to interface with the different thread managers (Requirements Manager, Testing Manager, Training Manager, Quality Assurance/Quality Control Manager) based on the activity being discussed. This is not an efficient or workable system; but more importantly, it deviated materially from what was required by the RFP.

19

(Pet'r's Br. at 35.)

In addition, Petitioner asserts that the Director "incorrectly concluded that the RFP did not require a lead Project Manager plus multiple Lines of Business project managers, misreading the RFP and ignoring the textual significance of the RFP requirement 'The Lot 1 selected Offeror must provide *project managers* [plural] across all Lot 1 lines of business.'" *Id.* at 42 (emphasis and brackets in brief). According to Petitioner, "the RFP contemplated and anticipated that each offeror would include multiple project managers for the Lines of Business in addition to the overall Project Manager for the contract." *Id.*

In its brief, PCG contends the "Director and the Department [] reasonably concluded that PCG would not receive an unfair competitive advantage as a result of omitting a breakdown of hours by task or the specific names of individual project managers." (Intervenor's Br. at 29.) In this regard, PCG notes that its "proposal clearly acknowledged that it was required to provide project managers across all Lot 1 lines of business and PCG never took exception to, or requested relief from, that requirement" and, thus, "[t]his requirement became part of PCG's contract with the [Department]." *Id.* at 29-30. In the words of PCG:

> In sum, PCG submitted a proposal that included all staff required to perform the full scope of the contract, without exception, including the specifically identified Project Manager, and others who would serve as project managers across all Lot 1 lines of business. PCG did not get any price advantage because it did provide all project managers for the fixed price included in its proposal; it simply did not have to name them. This confers no competitive advantage.

*Id.* at 30.

In support of the Director's final determination, the Department's contentions mirror those advanced by PCG. Further, the Department contributes the following elaboration:

> Contrary to [Petitioner's] assertion, PCG[] was not required to name a specific project manager for each line of business within the scope of Lot 1 of [the] RFP[.] In actuality, [the Department] only required that an offeror specifically identify individuals for those positions designated as Key Personnel. For non-Key Personnel, offerors were required to identify individuals by name, only "*if available*." The Department identified the following as Key Personnel: Executive Account Director, Project Manager, Requirements Manager, Testing Manager, Quality Assurance/Quality Control Manager, Functional Lead, and Training Manager. Each of these roles was singular, requiring only one person in each key role. The Project Manager's prescribed responsibilities also plainly reference a single individual performing in that role. PCG[] identified an individual for each of these Key Personnel positions, including a Project Manager. As such, PCG[] fully complied with the only RFP requirement for specifically identifying an individual as a project managers by identifying the overall Project Manager as part of its response to Key Personnel.

*Id.* at 39-40 (emphasis in original).

Here, assuming, *arguendo*, the project managers criteria was mandatory, the Department, acting pursuant to *Gaeta*, could waive PCG's omission if the effect of the waiver would not deprive the Department of the assurance that the contract would be entered into and performed by PCG, and the waiver would not confer a competitive advantage on PCG when compared to Petitioner. Initially, the RFP directed that offerors propose one overall "Project Manager," dedicated as "Key Personnel," who would be "responsible and accountable for controlling and monitoring all phases of projects being planned or executed," and further instructed that "[t]he Lot 1 selected [o]fferor must provide project managers across all Lot 1 lines of business who will

21

assess changes, risks, and issues relative to the predefined schedule, performance, and budget." (R.R. at 120a.) In accordance with our observation above, we conclude that, consistent with the unambiguous terms of the RFP, PCG—at the very least— substantially complied by listing the overall "project manager" and all other positions identified as "Key Personnel." *See supra* note 5. Moreover, as previously stated, PCG provided lengthy documentation that sufficiently outlined and explained its planned approach to accomplish the "tasks" section of the project, the level of effort necessary to complete the specified requirements of the project, the number of projected employees by position and total amount of labor hours for each employee by position, albeit not by a specified task or line of business. On this note, even if the RFP required PCG to list subordinate or "second tier" or "sub-project managers" for each business that was headed by an individual identified as "Key Personnel"—*i.e.*, Executive Account Director, Project Manager, Requirements Manager, Testing Manager, Quality Assurance/Quality Control Manager, Functional Lead, and Training Manager—we are unable to discern how PCG's omission in this regard placed PCG's assurance that it would satisfactorily complete the contract into jeopardy or conferred PCG with an unfair advantage. Specifically, PCG did not obtain a price advantage because it is bound by its proposed price, irrespective of how many "project managers" are needed, and PCG attested that it will provide all the necessary and enumerated "project managers" when it comes time for performance of the contract.

Therefore, we conclude that PCG provided the Department with adequate information upon which the Department could be assured that PCG would perform the contract according to the RFP's specified requirements and that PCG did not obtain an unfair competitive advantage. As such, the Director did not err in determining that the

22

Department did not engage in arbitrary or capricious conduct, or otherwise commit legal error, in awarding the contract to the PCG.

### III. Conclusion

Accordingly, for the above-stated reasons, we affirm the April 23, 2021 final order and determination of the Department, acting by and through the Director.


_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

KPMG LLP,
           Petitioner

        v.

Commonwealth of Pennsylvania,
Department of Human Services,
           Respondent

:
:
:  No. 491 C.D. 2021
:
:
:
:
:

## ***ORDER***

AND NOW, this 2nd day of May, 2022, the April 23, 2021 final determination of the Commonwealth of Pennsylvania, Department of Human Services, is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge